UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| SHARON FREEMAN and MARK FREEMAN, individually, on behalf of all wrongful death beneficiaries, and on behalf of the ESTATE OF PHILLIP FREEMAN, § § § § § | | |
| Plaintiffs, § § | | Civil Action No. |
| v. § § | | 1:23-cv-1295 |
| TEXAS DEPARTMENT OF CRIMINAL JUSTICE, and OFFICERS DOE 1-100, § § § § | | |
| Defendants. § | | |

## PLAINTIFFS' COMPLAINT

Plaintiffs Sharon Freeman and Mark Freeman bring this 42 U.S.C. § 1983, Americans with Disabilities Act, and Rehabilitation Act lawsuit against Texas Department of Criminal Justice (TDCJ) and unknown TDCJ correctional Officers Doe 1 through 100, because their actions senselessly caused the death of Plaintiffs' son, Phillip Freeman.

### I. PARTIES

### A. Plaintiffs

1. Sharon Freeman is the natural mother of the deceased, Phillip Freeman. Ms. Freeman resides in Montgomery County, Texas.

2. Mark Freeman is the natural father of the deceased, Phillip Freeman. Mark Freeman resides in Montgomery County, Texas.

3. Ms. Freeman and Mr. Freeman bring their claims under the Texas Survival Statute as the representatives of Phillip's estate (of which each is an heir at law), and under the Texas Wrongful Death Act on behalf of themselves and all wrongful death beneficiaries.

4. Phillip had no surviving spouse, no surviving children, and died intestate.

### B. Defendants

5. Defendant Texas Department of Criminal Justice (TDCJ) administers the state prison system, is a governmental unit, and is an agency of the State of Texas. TDCJ may be served with process through its executive director, Bryan Collier, at 861-B I-45 N., Huntsville, Texas 77320.

6. At all relevant times, TDCJ administered the Alfred D. Hughes Unit state prison, located at 3201 FM 929, Gatesville, Texas 76597 in Coryell County, Texas (Hughes Unit).

7. At all relevant times, the Hughes Unit was a public facility with programs and services for which Phillip was otherwise qualified.

8. TDCJ is a recipient of federal funds and received federal funds at all relevant times, including for programs, services, or facilities at the Hughes Unit.

9. The Officer Doe Defendants, whether one or several, are sued under pseudonyms because their identities are not known to Plaintiffs at this time. The Officer Doe defendants are the pseudonyms for the correctional officer or officers assigned to watch Phillip and Phillip's housing area at the Hughes Unit on or about February 14, 2022 at 10:11 p.m. This information is sufficient for Officer(s) Doe to be identified by Defendant TDCJ.

10. At all relevant times, each Officer Doe was employed by TDCJ as a correctional officer in the Hughes Unit.

11. At all relevant times, each Officer Doe was acting under color of law.

12. Each Officer Doe may be served with process at the Hughes Unit, 3201 FM 929, Gatesville, Texas 76597 in Coryell County, Texas.

## II. JURISDICTION AND VENUE

13. This case is brought pursuant 42 U.S.C. § 1983, and the Americans with Disabilities Act (42 U.S.C. § 12131, et. seq.) and Rehabilitation Act (28 U.S.C. § 794). Thus, this Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).

14. The Court has personal jurisdiction over all the Defendants as, at all relevant times, they each resided in, and/or were employed in, the Western District of Texas.

15. In addition, TDCJ's offices including legal offices where records directly related to this case are stored in Austin, Texas.

16. As all relevant events occurred within the Western District of Texas, venue is proper in this Court pursuant to 28 U.S.C. § 1391(c).

## III. FACTS

17. Plaintiffs' son, Phillip Freeman, died of suicide at age 44 while he was incarcerated in the TDCJ Hughes Unit on February 14, 2022.

### A. The Tragic and Preventable Suicide Death of Phillip Freeman

18. At the time of his death, Phillip had been a TDCJ prisoner for crimes against property since 2017.

19. Phillip was assigned to the Hughes Unit.

20. Phillip had longstanding, recurring mental illnesses that were known to TDCJ and its contractor, the University of Texas Medical Branch (UTMB), with whom TDCJ contracted for all medical services at the Hughes Unit.

21. UTMB and its medical staff within the TDCJ prison system were agents and representatives of TDCJ at all relevant times.

22. Phillip's longstanding mental illnesses included symptoms of severe depression, hopelessness, psychiatric decompensation, poor coping skills, and paranoia formally observed by prison medical staff in 2021.

23. Phillip's mental illnesses dated back to before his incarceration, but he had been diagnosed with anxiety disorder since 2018 and mood disorder since the middle of 2021 by prison medical staff.

24. Phillip's mental illnesses affected his major life activities including his thinking and the function of his brain, so he was a person with a disability at all relevant times. 29 C.F.R. § 1630.2(j)(3).

25. TDCJ knew Phillip's mental illnesses impaired his major life activities including because he had previously received inpatient mental health treatment within the TDCJ system that had required his transfer to a different TDCJ facility, the Skyview Unit, in July of 2021 for decompensation with paranoia, anxiety, and depression.

26. While he was housed at Skyview, Phillip was observed talking to himself and pacing multiple times. Prison medical staff found him to be depressed, scared, anxious, internally preoccupied, and delusional.

27. After his return from the Skyview Unit, Phillip was assigned by TDCJ to live at the Hughes Unit.

28. TDCJ also knew of Phillip's mental illnesses because medical staff prescribed him citalopram, a medicine to treat depression, and risperidone, an antipsychotic medication, which he was given every day by medical staff.

29. TDCJ also knew of Phillip's mental illnesses because he was designated under the agency's inmate medical and mental health classification system as having limitations in his assignments within the prison system due to his mental health.

30. TDCJ's security staff knew about Phillip's mental health classification.

31. In January of 2022, Phillip continued to exhibit delusional behavior, such as believing his gastrointestinal symptoms were due to his food being poisoned.

32. On February 12, 2022, Phillip was seen by a prison medical provider at the Hughes Unit who found that Phillip had multiple self-inflicted lacerations.

33. Phillip admitted to medical staff that he had a plan to kill himself and current suicidal ideation.

34. When medical staff asked Phillip if anything would change his mind about killing himself, Phillip said no, and that he was unwilling to consider alternatives to self-harm.

35. Phillip's prison medical providers determined that he was at an imminent risk for suicide.

36. Prison medical staff informed TDCJ security and classification staff, including the Hughes Unit warden, that Phillip needed to be transferred to crisis management.

37. Crisis management requires that an inmate be placed in a specially prepared and approved cell that reduces the opportunity for the inmate to kill or harm themselves, and involves regular observation by staff that are specially trained in behavioral health.

38. However, TDCJ security and classification staff intentionally decided not to transfer Phillip to crisis management.

39. Instead, TDCJ security and classification staff placed Phillip on "Constant and Direct Observation," or "CDO," which is supposed to be a short-term alternative to crisis management.

40. TDCJ is bound by policies that dictate that, during Constant and Direct Observation, a TDCJ officer must constantly observe the inmate while that officer has the means to intervene to prevent self-injury.

41. Phillip needed at least Constant and Direct Observation because TDCJ intentionally did not transfer him to a cell that reduces the opportunity for the inmate to kill or harm themselves and because the staff assigned to observe the inmate in CDO do not have behavioral health training.

42. TDCJ also housed Phillip in a cell by himself which was not specially prepared or approved to reduce the risk of suicide.

43. On February 14, 2023, Phillip's symptoms, including his explicit expressions of his intent to commit suicide, continued and medical staff reaffirmed that he needed to be transferred to crisis management.

44. On February 14, 2023, TDCJ kept Phillip assigned to a holding cell which had grates that could be used to tie-off a ligature.

45. On February 14, 2023, TDCJ provided Phillip with pieces of clothing that could be used to fashion a ligature.

46. Accordingly, due to TDCJ's intentional decisions about where to house Phillip, the sole protection Phillip had from his known imminent and substantial risk of suicide was the promise of Constant and Direct Observation mandated by his medical providers and by policies governing TDCJ.

47. Each of the Officer(s) Doe was trained on the requirements of Constant and Direct Observation—including the requirement that an officer constantly observe the inmate and that the officer have the means to intervene to prevent self-injury.

48. Prior to Phillip's death, each of the Officer(s) Doe was informed that Phillip required Constant and Direct Observation due to his imminent and substantial risk of death from suicide.

49. Each of the Officer(s) Doe was assigned to provide Phillip Constant and Direct Observation on February 14, 2022.

50. On February 14, 2022 prior to his death, TDCJ and each Officer(s) Doe knew that if Phillip was not constantly and directly watched by an officer who had the means to intervene and prevent self-injury, then Phillip would be at imminent and substantial risk of serious harm from suicide.

51. On February 14, 2022 prior to his death, TDCJ and each Officer(s) Doe knew that Phillip would be at imminent and substantial risk of suicide because of Phillip's disabilities, including his mental illnesses, in the absence of the accommodation of either Crisis Management or Constant and Direct Observation.

52. A known and obvious consequence of not constantly and directly watching a person who is at imminent and substantial risk of suicide, like Phillip at the time on February 14, 2022, is that the person will die from suicide.

53. A known and obvious consequence of not intervening to interrupt self-injury for a person who is at imminent and substantial risk of suicide, like Phillip was at the time, is that the person will die from suicide.

54. Nonetheless, on February 14, 2022, TDCJ and Officer(s) Doe intentionally failed to constantly observe Phillip and failed to intervene to prevent Phillip from harming himself.

55. As a direct and proximate result, Phillip fashioned parts of his TDCJ-issued clothes into a ligature, affixed it to part of his cell, and asphyxiated on the ligature by hanging on February 14, 2022.

56. TDCJ and Officer(s) Doe did not respond to Phillip's acts of preparing for and conducting the suicide until it was too late.

57. As a direct and proximate result of TDCJ and each Officer(s) Doe's failures, Phillip died from suicide that occurred at the Hughes Unit on February 14, 2022.

58. Had TDCJ reasonably accommodated Phillip's disabilities, he would have likely completed his remaining prison term and returned home to his family on or around his projected release date of December 2024.

**B. TDCJ's Habitual Failure to Protect**

59. Phillip's death came as no surprise to TDCJ.

60. Most state prisons in the United States rarely experience inmate suicide.

61. In contrast, the Texas prison system allows dozens of prisoners to die from suicide each year.

62. Moreover, even though Texas is incarcerating fewer people in prisons year after year, the number of suicide victims in TDCJ has steadily increased for the last twenty years.

63. Texas has a higher rate of death from suicide by state prisoners per capita than the nation as a whole.

64. Approximately 232 TDCJ prisoners died from suicide in the five years before Phillip's death.

65. The Hughes Unit is one of the prisons starkly affected by TDCJ's failure to prevent suicide.

66. In the five years before Phillip passed away, eight other inmates died from suicide at the Hughes Unit.

67. This five-year rate of suicide at the Hughes Unit means that the per capita rate of death from suicide by state prisoners inside the Hughes Unit was more than fifty percent higher than the

per capita rate for TDCJ prisoners as a whole—and more than double that of the nation's state prisons.

68. Each person assigned to the Hughes Unit before Phillip's death was far more likely to die from suicide compared to a person assigned somewhere else inside TDCJ or in a different state prison.

69. On information and belief, the majority of previous deaths by suicide at the Hughes Unit in the five years before Philip died were also caused by TDCJ's failures to monitor and intervene to protect inmates.

70. Despite this, on information and belief, TDCJ did not discipline, retrain, or increase its supervision of officers at the Hughes Unit relating to prevention of death by suicide.

71. On information and belief, TDCJ did not make any substantive improvements to any policies at the Hughes Unit to prevent death by suicide.

72. TDCJ also did not fix the problems after Phillip died.

73. In the same year Phillip died, four other Hughes Unit inmates died from suicide.

## IV. CAUSES OF ACTION

### A. Eighth Amendment Denial of Medical Attention (against Officer(s) Doe 1-100 Only)

74. Plaintiffs incorporate by reference all of the foregoing and further allege as follows:

75. Phillip had a clearly established right to be protected from his suicidal tendencies and not to have his serious medical needs treated with deliberate indifference. Rather than provide Phillip the constant and direct observation and immediate intervention that he desperately needed, and that Officer(s) Doe knew Phillip needed, Officer(s) Doe deliberately disregarded Phillip's imminent, substantial risk of suicide.

9

76. Officer(s) Doe disregarded Phillip's known imminent and substantial risk of suicide by failing to constantly observe Phillip, despite being specifically ordered to do so, and by failing to immediately intervene to prevent self-injury, despite being specifically ordered to do so.

77. Officer(s) Doe knew about the imminent and serious risk posed by Phillip's plan for suicide, history of self-harm, mental illnesses, and suicidal ideation. Officer(s) Doe were specifically informed of that risk from credible sources including their immediate supervisor(s) and medical staff. Officer(s) Doe knew they were responsible for ensuring Phillip's safety with constant and direct observation and with intervening to prevent self-injury based on their training, direct instructions, and policies governing TDCJ.

78. Each Officer(s) Doe drew the inference that if they failed to constantly and directly observe Phillip, and to intervene to prevent self-injury, then Phillip would be seriously injured or killed. Officer(s) Doe nonetheless disregarded that risk by failing to constantly and directly monitor Phillip and failing to immediately intervene to prevent self-injury. Thus, Defendants were each deliberately indifferent to Phillip's serious medical needs.

79. As a direct and proximate consequence of Defendants' actions and omissions, Phillip died from suicide.

80. Thus, Defendants Officer(s) Doe 1-100 are liable under 42 U.S.C. § 1983 for violations of Phillip's rights under the Eighth Amendment to the U.S. Constitution, and are liable to the Plaintiffs for compensatory and punitive damages.

### B. Americans with Disabilities Act and Rehabilitation Act (against Texas Department of Criminal Justice Only)

81. Plaintiffs incorporate by reference all of the foregoing and further allege as follows:

82. Texas Department of Criminal Justice was, at all relevant times, a recipient of federal funds, and thus covered by the mandate of the Rehabilitation Act. The Rehabilitation Act requires

recipients of federal monies to reasonably accommodate persons with mental disabilities in their facilities, programs, activities, and services and reasonably modify such facilities, services, and programs to accomplish this purpose. 29 U.S.C. § 794.

83. Likewise, Title II of the Americans with Disabilities Act (as amended in 2008) also applies to Texas Department of Criminal Justice, and also requires TDCJ to make reasonable modifications of the prison to accommodate people with disabilities. 42 U.S.C. § 12131 et seq.

84. The TDCJ Hughes Unit is a facility, and its operation comprises a program and service, for Rehabilitation Act and ADA purposes.

85. Incarceration, safe housing, crisis management, inpatient psychiatric care, outpatient psychiatric care, and Constant and Direct Observation are among the programs and services TDCJ provided to people for which Phillip was otherwise qualified.

86. For the purposes of the ADA and Rehabilitation Act, Phillip was a qualified individual with a disability—mental illnesses including depression, anxiety, mood disorder, and suicidal tendencies—that substantially limited one or more of his major life activities. Phillip had a mental impairment that substantially limited one or more of his major life activities, or the operation of one or more of his major bodily systems. Specifically, Phillip's mental illnesses impaired the operation of his brain, and substantially limited his ability to think, sleep, communicate, and care for himself, as described above. *See* 42 U.S.C. § 12102(1)-(2).

87. Defendants knew that Phillip was a person with a disability. TDCJ knew his mental illness had required previous inpatient psychiatric treatment. TDCJ knew he was prescribed multiple psychiatric medications including citalopram and risperidone. TDCJ knew that because of his mental illness, Phillip had expressed suicidal ideations before, had a plan to commit suicide, had injured himself, wanted to die by suicide, and had been specifically and formally designated by

TDCJ's choice of medical staff as a person at imminent and substantial risk of lethal self-harm and suicide.

88. Despite this actual knowledge of Phillip's disability and need for accommodations, agents of TDCJ intentionally discriminated against Phillip under the meaning of the statutes by purposefully denying him reasonable accommodations such as (but not limited to): (a) medical and psychiatric treatment; (b) modifications to his cell (such as removing "tie-off" points, or housing with a cell mate); (c) transfer to a crisis management cell; (d) confiscating his uniform and bedding until such time as he could receive a psychiatric evaluation and treatment; (d) constant and direct observation to guard against death by suicide; (e) suicide watch; (f) safe housing; and (g) adequate staffing.

89. Thus, the Texas Department of Criminal Justice failed and refused to reasonably accommodate Phillip's mental disabilities while he was in custody, in violation of the ADA and Rehabilitation Act. That intentional failure and refusal proximately caused his death.

90. As Phillip died as a direct and proximate result of Texas Department of Criminal Justice's intentional discrimination against him, Plaintiffs are entitled to compensatory damages against TDCJ.

### V. DAMAGES

91. Plaintiffs incorporate by reference all of the foregoing and further allege as follows:

92. The actions and omissions of Defendants, their agents, employees, and/or representatives caused and/or were the moving force of the injuries and damages to the Plaintiffs and were the moving force of Phillip's wrongful death. Plaintiffs thus assert claims for compensatory damages under the ADA, Rehabilitation Act, and § 1983 against all Defendants.

93. Plaintiffs further seek punitive or exemplary damages against the individual defendants only under 42 U.S.C. § 1983.

94. Plaintiffs, in their capacity as representatives and heirs-at-law of Phillip's Estate, assert a survival claim on behalf of the estate. The Estate has incurred damages including, but not limited to, the following:

   a. Conscious pain and mental anguish; and,

   b. Funeral and burial expenses.

95. Plaintiffs, in their capacities as wrongful death beneficiaries, assert claims on their own individual capacities (and for any other unknown wrongful death beneficiaries). Plaintiffs and all other wrongful death beneficiaries have incurred damages including, but not limited to, the following:

   a. Past and future mental anguish;

   b. Past and future loss of companionship and society;

   c. Past and future medical expenses; and,

   d. Past and future pecuniary loss, including loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value.

96. Plaintiffs, for themselves and any other wrongful death beneficiaries, and the Estate, are also entitled to recover attorneys' fees, court costs, and litigation expenses, including expert expenses, pursuant to the ADA and Rehabilitation Act (42 U.S.C. § 12205 and 29 U.S.C. § 794a), 42 U.S.C. § 1988, and as otherwise allowed by law.

## VI. Jury Demand

97. Plaintiffs respectfully request a trial by jury.

## VII. Prayer for Relief

98. To right this grave injustice, Plaintiffs request the Court:

a. Award compensatory damages to the Plaintiffs against all the Defendants, jointly and severally;

b. Award punitive damages to the Plaintiffs, against only the individual Defendants;

c. Find that Plaintiffs are the prevailing party and award Plaintiffs costs, including expert fees and attorneys' fees pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 12205;

d. Award Plaintiffs pre-judgment and post-judgment interest at the highest rate allowable under the law; and,

e. Award and grant such other just relief as the Court deems proper.

Date: October 24, 2023.

Respectfully submitted,

**EDWARDS LAW**
603 W. 17TH ST.
AUSTIN, TX 78701
Tel. 512-623-7727
Fax. 512-623-7729

By  /s/ Jeff Edwards
    JEFF EDWARDS
    State Bar No. 24014406
    jeff@edwards-law.com
    DAVID JAMES
    State Bar No. 24092572
    david@edwards-law.com
    LISA SNEAD
    State Bar. No. 24062204
    lisa@edwards-law.com
    PAUL SAMUEL
    State Bar No. 24124463
    paul@edwards-law.com

**ATTORNEYS FOR PLAINTIFFS**